CR 00-29 PAM

The burden of proof of guilt is on the United States.

The United States has not met the burden of proof in the following:

Never proven that I received money from the ministry for my own use.

Never proven that I counseled the people who are making claims.

Never proven that I intended to mislead people. No such intent has ever been proven.

Never proven that money was illegaly gained through the ministry by me, or anyone else.

Never proven that money allegedly illegaly gained was knowingly laundered through a private company by me, or anyone.

Never proven that money allegedly laundered came from the psychic ministry.

Never proven that the church and it's ministries are not legitimate.

Never proven that our religion is not protected by the First Amendment.

Never proven that the amount of money assesed for 'restitution' came into the ministry during the time frame of the alleged offense. (Restitution cannot be assesed for a period of time when there is no offense.)

Never proven that I ever used an alias in my volunteer church duties, or that I ever threatened anyone at anytime.
Theories are not proof.
Formal charges are not proof.
Statements prepared by agents of the U.S. are not proof.
Hearsay is not proof.
Slanderous statements are not proof.
Wild talk is not proof.
The use of force and violence is not proof.

Until a case is proven, no sentence can be legal. Therefore I was unlawfully detained and unlawfully assesed restitution. I am not required by any law to pay money to the United States that is unlawfully assesed. The failure of the United States to meet the burden of proof to support any of the charges against me negates the entire case.

SCANNED
NOV 2 1 2005
U.S. DISTRICT COURT MPLS

IN THE UNITED STATES DISTRICT COURT FOR THE EASTERN DISTRICT OF CALIFORNIA

UNIVERSAL LIFE CHURCH, INC.

Plaintiff MAR 1, 1974 -Vs- United States of America

Defendant Civil No. S-1964

Order

"From the Findings of Fact, the Court concludes, as a matter of law, that the plaintiff should prevail. Certainly, one seeking a tax exemption has the burden of establishing his right to a tax-exempt status. An organization qualifies for an exemption under 26 U.S.C. Sec. 501(c)(3) only if it is 'organized and operated exclusively for religious purposes.* * *1 In the defendant's Memorandum in Support of its requested Instructions, filed February 28, 1973, 'the government admits that the plaintiff passes the organizational test.'... "The Court must then address itself to the defendant's second conclusion: that the ordination of ministers, the granting of church charters and the issuance of Honorary Doctor of Divinity certificates by the plaintiff are substantial activities which do not further any religious purpose. Certainly the ordination of ministers and the chartering of churches are accepted activities of religious organizations. The defendant impliedly admits the same on Page 5 of its Memorandum in Support of its Requested Instructions. The fact that the plaintiff distributed ministers' credentials and Honorary Doctor of Divinity certificates is of no moment. Such activity may be analogized to mass conversions at a typical revival or religious crusade. Neither this Court, nor any branch of this Government, will consider the merits or fallacies of a religion. Nor will the Court compare the beliefs, dogmas, and practices of a newly organized religion with those of an older, more established religion. Nor will the Court praise or condemn a religion, however excellent or fanatical or preposterous it may seem. Were the Court to do so, it would impinge upon the guarantees of the First Amendment... "IT IS THEREFORE ORDERED that the plaintiff be and is entitled to a Federal Tax Exemption and to a refund of all monies levied against by the defendant with interest thereon from the date of levy, March 19, 1970. "IT IS FURTHER ORDERED that the defendant's counterclaim be and is dismissed and the plaintiff is entitled to recover the reasonable costs of the suit herein. "IT IS ALSO ORDERED that the plaintiff submit and appropriate judgement in accordance herewith.

"Done and dated this 27th day of February, 1974."

James F. Batten

United States District Judge

mayo

Mayo Clinic
200 First Street SW
Rochester, Minnesota 55905
507-284-2511

Department of Psychiatry
& Psychology

October 2, 2000

RE: Reverend Merna Jean Sunde
MC#: 2-244-302
DOB: 05-13-1934

Mr. Bill Michael
U.S. Attorney
U.S. Department of Justice
600 United States Courthouse
300 South Fourth Street
Minneapolis, MN 55415

Dear Mr. Michael:

As you are aware today, Reverend Merna J. Sunde was released in the custody of the United States Marshall Service because of a warrant for her arrest. Throughout Reverend Sunde's hospital course, discussions occurred among the Mayo Clinic Legal Department, psychiatric inpatient staff, and yourself as prosecutor for the office of the Unites States District Attorney. As discussed at length previously, Reverend Sunde will require suicide precautions with intensive monitoring, preferably on a one-to-one basis while she is incarcerated. In addition, Reverend Sunde will need continued medical and psychiatric care. The psychiatric care is to include individual and/or group psychotherapy as well as medication management. To assure Reverend Sunde's safety and ultimate recovery from her major depressive disorder, it is imperative as we discussed that both Reverend Sunde's mental health needs and medical issues be given close attention.

I hope this information is helpful to you. If I can be of any further assistance, please do not hesitate to contact me.

Sincerely,

Michael M Reese, MD

Michael M. Reese, M.D.

MMR:

CC: U.S. Marshall Service
Paul Applebaum Esq.
Sherry Hubert/Mayo Legal Department/Fax# 284-0929)

EXHIBIT 1a

UNITED STATES DISTRICT COURT
DISTRICT OF MINNESOTA
CR-0029(1) (PAM/ESS)

---

United States of America,

Plaintiff,

v.

**AFFIDAVIT OF PAUL APPLEBAUM**

Merna Sunde,

Defendant.

---

State of Minnesota )
) ss.
County of Ramsey )

Paul Applebaum, being first duly sworn upon oath, deposes and states as follows:

1. I am the attorney of record for Defendant Merna Sunde in the case in U.S. v. Sunde.

2. Yesterday I visited Ms. Sunde in the Sherburne County Jail. Ms. Sunde is being detained pursuant to an order of this Court on the grounds that Ms. Sunde presents a danger to herself as well as a flight risk.

3. Yesterday when I visited Ms. Sunde she was disoriented, unable to communicate, appeared to have developed a palsy in her hands and feet.

4. During our conversation, Ms. Sunde appeared unable to formulate any concrete thoughts. Essentially, the only thing she said to me during our meeting was "Don't let me die in here." She also asked me why she was in jail. Ms. Sunde was utterly incapable of discussing her case with me.

EXHIBIT 1b

5. In addition, Ms. Sunde appears to have lost a great deal of weight in a short time span. Her color was a greenish-gray.

Dated: October 12, 2000.

Paul Applebaum

Subscribed and sworn to before
me this 13th day of October, 2000.

Carol A. Rumple
Notary Public

CAROL A. RUMPLE
NOTARY PUBLIC - MINNESOTA
MY COMMISSION
EXPIRES JAN. 31, 2005

# Naeve Behavioral Health

*Mayo Health System*

June 14, 2000

Mr. Paul Applebaum
Applebaum Law Firm
The Minnesota Building
46 East Fourth Street
Suite 1030
St. Paul, Minnesota 55101

Re: Merna Sunde
DOB 5/13/34
SSN 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

Dear Mr. Applebaum,

As requested, with release of information from Ms Merna Sunde, this letter is to inform you of her current major health concern, and its impact on her upcoming trial.

Ms Sunde is currently experiencing a major depression. This is a condition characterized by disruption in sleep, appetite, energy, concentration, and general awareness. Ms Sunde has previously had another experience with this many years ago which disabled her from her public service work.

This condition has only recently begun to be treated, having been recognized by her primary physician and then referred for further psychiatric care. The treatment of depression generally involves the use of medication, which she has begun, counseling which she has also started, and avoidance of high stress producing situations. The initial stabilization of patients often takes three to four months. Ms Sunde in her prior episode required over a year for stabilization, thus I am uncertain as to the length of time it will take for her to recover.

During the course of major depression, Ms Sunde is demonstrating difficulties with attention, concentration, organization of thoughts, and her ability to follow changes in the course of interaction, as represented by her focus on one issue alone, and failure to recognize when others have moved on to alternative topics. These difficulties will impair her ability to assist in



Exhibit A

EXHIBIT 1c

her behalf with a trial or legal proceedings.

The major risk from major depression is suicide and death, while not currently endorsing thoughts of suicide, or plan for same, Ms Sunde could experience this with additional stress or if she felt that she had no other options. Given this risk (general population studies would suggest as high as 15% with depression), my recommendation would be to postpone any court activities or preparation for these for a minimum of three to four months to allow her to stabilize with the depression.

This estimate of time is based on general population studies as the amount of time required to improve with depression. As stated above, Ms Sunde has previously demonstrated the need for over a year to improve. Given the improvements in medication therapies available today, which were not available at that time, it is hopeful that her recovery will be more timely.

Please contact me if further information is required.

Sincerely,

Karen Gosen MD

Karen M. Gosen, M.D.
Psychiatrist

# CENTRAL MINNESOTA MENTAL HEALTH CENTER - DIAGNOSTIC ASSESSMENT

**Name:** Rev. Merna Sunde-Martin D.D.
**Billing Diagnosis (DSM-IV):** 296.33
**Sup-Pop Code:** S

**DA Date:** 10/3/2000 **CHART:**

**IDENTIFYING INFORMATION:**
Date of Birth: Legally uses 5-13-34 because that's when it was registered but she says she was actually born 6-5-30.
Gender: female
Race: Caucasian
Employment: Retired pastor from United Pastoral Ministry and Universal Life Church in Albert Lea, MN
City of residence: Presently Sherburne County Jail, Elk River, MN.

**REFERRAL SOURCE:** Nursing staff (Linda W?) from Sherburne County Jail phoned requesting suicidality/lethality assessment on 10/3/00.

**LIMITS OF CONFIDENTIALITY:** Rev. Sunde was informed of limits of confidentiality including mandated reporting for child abuse or vulnerable adults, suicidality and court orders.

**PRESENTING PROBLEM:** Linda W? phoned from Sherburne County Jail for suicidal assessment and requesting recommendations for Rev. Merna Sunde. Rev. Sunde had been admitted to this jail the night before this assessment. Merna reports that she had been at St. Mary's Hospital Psychiatric Unit in Rochester, MN for the past month and a bit more and had expected that she would be going home in "a couple of weeks" and participate in outpatient therapy. Instead she ended up here (the jail) and she said she didn't know why the court felt they had to do that to her. She reports that the psychiatrist at St. Mary's Hospital recommended she stay in the hospital and then transfer to outpatient. She participated in individual and also daily group therapy. She said she felt the group therapy helped with her depression because she could talk with other people about issues. Merna clearly denied that she felt suicidal at this time and said the suicidal thinking was passing. She had decided it wasn't something she wanted to do anymore because she thought "God would be offended" by it.

Merna reports that she has had difficulty with her memory for the past 6 months to a year. Prior to her hospitalization, she had been losing weight because food didn't seem to taste good. (She said she gained weight in the hospital.) She had been having difficulty with sleep—both difficulty getting to sleep initially and then experiencing interrupted sleep and difficulty getting back to sleep. She has been feeling hopeless and lonely. She is also reporting very low energy which continues. She said she felt she was making some progress on these symptoms while in the hospital. She reports she has had a history of depression and had been hospitalized 20+ years ago for treatment as well. She identified the beginning of this depressive episode as about 2 years ago. Merna is presently concerned about whether or not she will slide back in her symptoms since she's no longer in the hospital and she says also because she was told she couldn't call her friends or other power of attorney friend (Scott Taylor) in Mankato. She also expressed concern about her animals who are at her home and being cared for by a friend. (She has taken in abandoned animals.) Therapist suggested she clarify possibilities with nursing staff. Merna is also very concerned about her court date coming up in the next couple of weeks—possibly Oct. 16, 2000.) She said she needs to be stronger before she can defend herself in court.

EXHIBIT 12

**EMERGENCY SUICIDAL ASSESSMENT**
**CLIENT:** Rev. Merna Sunde-Martin D.D.
**PAGE:** 2

**FUNCTIONAL IMPAIRMENT**: Rev. Sunde had difficulty with sleep and appetite prior to hospitalization. She also felt suicidal prior to hospitalization but says she no longer does. She reports little energy and memory problems.

**BRIEF RELEVANT BACKGROUND INFORMATION**: Rev. Sunde reports that when the Postal Service and IRS agents charged her with criminal activity and came to her home, they beat her and beat her dog who died from the beating.

She states that she used to teach art and likes to paint in water colors and oils and likes to read. She would also like to communicate with others—therapist again ~~reconnected~~ recommended that she would need to check about writing to friends but that she could simply write about her experiences if allowed and given materials.

**PREVIOUS MENTAL HEALTH SERVICES:** History of recovery including 2 reported hospitalizations, therapy and medication.

**PHYSICAL HEALTH:**
Medical Condition: Rev. Sunde reports that she has difficulty with feeling lightheaded and nauseous. She says on occasion, she has experienced passing out. She says she has to be careful of moving or of walking too long because these seem to trigger the experience. She also says she has had heart arrythmia and has been on medication and had surgery for that. She also reports changing blood pressure from high to low to high etc. She says this condition preceded being in St. Mary's Hospital Psychiatric Unit.
Medication: She identified the following psychotropic medications: Celexa 40mg, Wellbutrin SR 100 mg, Trazadone 50 mg as needed. (She says she has not used the Trazadone recently.)

**MENTAL STATUS/BEHAVIORAL OBSERVATIONS:**
Orientation(to person, place and time): Rev. Sunde appeared oriented to person, place and time. Thinking seemed clear.
Thought processes: no abnormalities noted
Thought content: no abnormalities noted but with possibly slight paranoid flavor.
Suicidal Ideation: Denied for present but she reported it evident in recent past.
Estimated intelligence: Average
Memory: Appeared intact relating to recent and recent past. Unknown for more remote memory.
Mood: Quite depressed
Affect: Very flay throughout assessment with tears when talking about her dog. Very slight smile at end of time. Appeared with little energy.
Appearance: Grooming and hygiene appeared appropriate. Seemed to have medium-large bone structure. Appeared younger than stated age.
Attention span: satisfactory
Eye contact: Generally held eye contact during conversation but stared off or at floor in between.
Motor activity: Sat quietly in wheelchair, slightly slumped depicting low energy
Behavior towards examiner: appropriate and cooperative

**EMERGENCY SUICIDAL ASSESSMENT**
**CLIENT:** Rev. Merna Sunde-Martin D.D.
**PAGE: 3**

**DIAGNOSTIC IMPRESSION:**

**AXIS I:** 296.32/3 Major Depression, Recurrent, Moderate to Severe
**AXIS II:** 799.9 Deferred
**AXIS III:** General Medical Conditions: Heart arrythmia, blood pressure problems as reported by client
**AXIS IV:** Psychosocial and Environmental Problems: Problems related to interaction with the legal system/crime; financial problems; problems with primary support group
**AXIS V:** Global Assessment of Functioning Scale Score: 50, present

**TREATMENT RECOMMENDATIONS:** Artist materials, writing materials and reading materials be made available to Rev. Sunde as is possible within jail limits. Monitoring should be continued to increase connectedness.

Catherine E. Huberty, MSW, LICSW, LMFT
Catherine E. Huberty, MSW, LICSW, LMFT
CEH:caw

ALMC Outpatient Phar
404 West Fountain St
Albert Lea, MN 5600
Tel: 507-373-7952
Fax: 507-373-7627

| | | | |
|---|---|---|---|
| PRESCRIPTION 01 0664692 | 1 | 5.00 | 5.00 |

| | |
|---|---|
| SUBTOTAL | 5.00 |
| TOTAL | 5.00 |
| CASH | 5.00 |
| CHANGE DUE | 0.00 |

Items = 1

Patient Counseling Declined

Receipt #: 56540
Clerk: S - SUE
Register #: 1
Drawer #: 2
Date/Time: 02/15/2005 13:56:11

470010 565408

HAVE A NICE DAY !!!

ALMC Outpatient Phar
404 West Fountain St
Albert Lea, MN 5600
Tel: 507-373-7952
Fax: 507-373-7627

| | | | |
|---|---|---|---|
| PRESCRIPTION 01 0652335 | 1 | 5.00 | 5.00 |
| PRESCRIPTION 01 0672689 | 1 | 5.00 | 5.00 |

| | |
|---|---|
| SUBTOTAL | 10.00 |
| TOTAL | 10.00 |
| CASH | 10.00 |
| CHANGE DUE | 0.00 |

Items = 2

Patient Counseling Declined

Receipt #: 115800
Clerk: S - SUE
Register #: 1
Drawer #: 5
Date/Time: 05/27/2005 12:45:53

470011 158005

HAVE A NICE DAY !!!

EXHIBIT 2a

ALMC Outpatient Phar
404 West Fountain St
Albert Lea, MN 5600
Tel: 507-373-7952
Fax: 507-373-7627

| | | | |
|---|---|---|---|
| PRESCRIPTION 01 0666648 | 1 | 5.00 | 5.00 |
| PRESCRIPTION 01 0666647 | 1 | 5.00 | 5.00 |

| | |
|---|---|
| SUBTOTAL | 10.00 |
| TOTAL | 10.00 |
| CASH | 10.00 |
| CHANGE DUE | 0.00 |

Items = 2

Patient Counseling Declined

Receipt #: 159697
Clerk: S - SUE
Register #: 1
Drawer #: 5
Date/Time: 08/19/2005 12:19:13

470011 596975

HAVE A NICE DAY !!!

ALMC Outpatient Phar
404 West Fountain St
Albert Lea, MN 5600
Tel: 507-373-7952
Fax: 507-373-7627

| | | | |
|---|---|---|---|
| PRESCRIPTION 01 0672689 | 1 | 10.00 | 10.00 |

| | |
|---|---|
| SUBTOTAL | 10.00 |
| TOTAL | 10.00 |
| CASH | 20.00 |
| CHANGE DUE | 10.00 |

Items = 1

Patient Counseling Declined

Receipt #: 93751
Clerk: JJ - JANE
Register #: 1
Drawer #: 2
Date/Time: 04/19/2005 16:07:06

470010 937519

HAVE A NICE DAY !!!

ALMC Outpatient Phar
404 West Fountain St
Albert Lea, MN 5600
Tel: 507-373-7952
Fax: 507-373-7627

| | | | |
|---|---|---|---|
| ALMOND BARK CHOC& 45371000000 | 1 | 5.75 | 5.75 T2 |

| | |
|---|---|
| SUBTOTAL | 5.75 |
| GIFT SHOP | 0.37 |
| TOTAL | 6.12 |
| CASH | 6.12 |
| CHANGE DUE | 0.00 |

Items = 1

Receipt #: 75214
Clerk: S - SUE
Register # 1
Drawer #: 5
Date/Time: 03/18/2005 13:45:06

470010 752143

HAVE A NICE DAY !!!

ALMC Outpatient Phar
404 West Fountain St
Albert Lea, MN 5600
Tel: 507-373-7952
Fax: 507-373-7627

| | | | |
|---|---|---|---|
| PRESCRIPTION 01 0666649 | 1 | 10.92 | 10.92 |
| PRESCRIPTION 01 0666647 | 1 | 5.00 | 5.00 |
| PRESCRIPTION 01 0666648 | 1 | 5.00 | 5.00 |
| PRESCRIPTION 01 0664692 | 1 | 5.00 | 5.00 |

| | |
|---|---|
| SUBTOTAL | 25.92 |
| TOTAL | 25.92 |
| CASH | 50.00 |
| CHANGE DUE | 24.08 |

Items = 4

Patient Counseling Declined

Receipt #: 75220
Clerk: JJ - JANE
Register #: 1
Drawer #: 5
Date/Time: 03/18/2005 13:54:16

470010 752204

HAVE A NICE DAY !!!

ALMC Outpatient Phar
404 West Fountain St
Albert Lea, MN 5600
Tel: 507-373-7952
Fax: 507-373-7627

| | | | |
|---|---|---|---|
| PRESCRIPTION<br>01<br>0652333 | 1 | 5.00 | 5.00 |
| PRESCRIPTION<br>01<br>0653855 | 1 | 15.00 | 15.00 |

| | |
|---|---|
| SUBTOTAL | 20.00 |
| TOTAL | 20.00 |
| CASH | 20.00 |
| CHANGE DUE | 0.00 |

Items = 2

Patient Counseling Declined

Receipt #: 67138
Clerk: J - JUDY
Register #: 1
Drawer #: 5
Date/Time: 03/04/2005 15:41:34

470010 671383

HAVE A NICE DAY !!!

ALMC Outpatient Phar
404 West Fountain St
Albert Lea, MN 5600
Tel: 507-373-7952
Fax: 507-373-7627

| | | | |
|---|---|---|---|
| PRESCRIPTION<br>01<br>0666649 | 1 | 10.92 | 10.92 |
| PRESCRIPTION<br>01<br>0666645 | 1 | 47.43 | 47.43 |
| PRESCRIPTION<br>01<br>0666648 | 1 | 5.00 | 5.00 |
| PRESCRIPTION<br>01<br>0666647 | 1 | 5.00 | 5.00 |
| ALMOND BARK CHOC&<br>45371000000 | 1 | 5.75 | 5.75 T2 |

| | |
|---|---|
| SUBTOTAL | 74.10 |
| GIFT SHOP | 0.37 |
| TOTAL | 74.47 |
| CASH | 90.00 |
| CHANGE DUE | 15.53 |

Items = 5

Patient Counseling Accepted

Receipt #: 65567
Clerk: RG - ROXANNE
Register #: 1
Drawer #: 3
Date/Time: 03/02/2005 15:51:06

470010 655673

HAVE A NICE DAY !!!

ALMC Outpatient Phar
404 West Fountain St
Albert Lea, MN 5600
Tel: 507-373-7952
Fax: 507-373-7627

| | | | |
|---|---|---|---|
| PRESCRIPTION | 1 | 5.00 | 5.00 |
| 01 | | | |
| 0661410 | | | |
| PRESCRIPTION | 1 | 5.00 | 5.00 |
| 01 | | | |
| 0661411 | | | |

| | |
|---|---|
| SUBTOTAL | 10.00 |
| TOTAL | 10.00 |
| CASH | 20.00 |
| CHANGE DUE | 10.00 |

Items = 2

Patient Counseling Accepted

Receipt #: 41773
Clerk: RM - RON
Register #: 1
Drawer #: 5
Date/Time: 01/21/2005 13:02:06

470010 417738

HAVE A NICE DAY !!!

ALMC Outpatient Phar
404 West Fountain St
Albert Lea, MN 5600
Tel: 507-373-7952
Fax: 507-373-7627

| | | | |
|---|---|---|---|
| PRESCRIPTION | 1 | 5.00 | 5.00 |
| 01 | | | |
| 0685500 | | | |
| PRESCRIPTION | 1 | 15.00 | 15.00 |
| 01 | | | |
| 0685498 | | | |

| | |
|---|---|
| SUBTOTAL | 20.00 |
| TOTAL | 20.00 |
| CASH | 20.00 |
| CHANGE DUE | 0.00 |

Items = 2

Patient Counseling Accepted

Receipt #: 132180
Clerk: RG - ROXANNE
Register #: 1
Drawer #: 1
Date/Time: 06/27/2005 14:51:53

470011 321805

HAVE A NICE DAY !!!

ALMC Outpatient Phar
404 West Fountain St
Albert Lea, MN 5600
Tel: 507-373-7952
Fax: 507-373-7627

| | | | |
|---|---|---|---|
| PRESCRIPTION | 1 | 5.00 | 5.00 |
| 01 | | | |
| 0652333 | | | |
| PRESCRIPTION | 1 | 5.00 | 5.00 |
| 01 | | | |
| 0643841 | | | |
| PRESCRIPTION | 1 | 15.00 | 15.00 |
| 01 | | | |
| 0653855 | | | |

| | |
|---|---|
| SUBTOTAL | 25.00 |
| TOTAL | 25.00 |
| CASH | 50.00 |
| CHANGE DUE | 25.00 |

Items = 3

Patient Counseling Declined

Receipt #: 41584
Clerk: S - SUE
Register #: 1
Drawer #: 5
Date/Time: 01/21/2005 10:21:13

470010 415840

HAVE A NICE DAY !!!

**MERNA SUNDE** CRK
Rx 0666648
08/19/2005
Signature:

ALBERT LEA MEDICAL CENTER
OUTPATIENT PHARMACY
404 FOUNTAIN 373-7952 ALBERT LEA, MN 56007

Rx 0666648 A R Dr. N. BURKEMPER
MERNA SUNDE (507) 377-3481
BOX 728 08/19/2005
ALBERT LEA MN, 56007
Ketoconazole Cream 2 % 30 GM
00093-0840-30 RGI JMF
CRK
Sub # 326A67160
Group # CALRX

ACK: NO
Account # 4379
8 00006 66648 0
**Customer pay** 5.00

**MERNA SUNDE** CRK
Rx 0666647
08/19/2005
Signature:

ALBERT LEA MEDICAL CENTER
OUTPATIENT PHARMACY
404 FOUNTAIN 373-7952 ALBERT LEA, MN 56007

Rx 0666647 A R Dr. N. BURKEMPER
MERNA SUNDE (507) 377-3481
BOX 728 08/19/2005
ALBERT LEA MN, 56007
Hydrocortisone Cream 2.5 % 30 GM
00168-0080-31 RGI JMF
CRK
Sub # 326A67160
Group # CALRX

ACK: NO
Account # 4379
8 00006 66647 3
**Customer pay** 5.00

**MERNA SUNDE** CRK
Rx 0672689
04/19/2005
Signature:

ALBERT LEA MEDICAL CENTER
OUTPATIENT PHARMACY
404 FOUNTAIN 373-7952 ALBERT LEA, MN 56007

Rx 0672689 A N Dr. L. AASHEIM
MERNA SUNDE (507) 377-3481
BOX 728 04/19/2005
ALBERT LEA MN, 56007
Levoxyl Tab 50 MCG 30 EA
52604-5050-05 JMF
CRK
Sub # 326A67160
Group # CALRX

ACK: NO
Account # 4379
8 00006 72689 4
**Customer pay** 10.00

*It all starts with care®*

2822194741

004095456

**Balance Due Upon Receipt**

**$0.00**

**Name:** MERNA SUNDE
**Address:** 414 CRESCENT DR BOX 728
ALBERT LEA, MN 56007

*Please return the top portion of this form with your payment.*
*See reverse side for payment or refund options.*

*Retain the bottom portion of this form for your records.*

CAREMARK
*It all starts with care®*

**Summary for Order:** 282219474
**Date:** 03/28/2005

| Prescription Details | Benefit Provider Paid | Co-Pay Amount |
|---|---|---|
| MERNA SUNDE<br>Rx# 705777980 Wellbutrn Xl TAB 300MG, Qty. 90 EA | $270.53 | $25.00 |
| MERNA SUNDE<br>Rx# 705778054 Minocycline CAP 100MG, Qty. 90 EA | $130.34 | $10.00 |

| | | |
|---|---|---|
| Shipping Charge | | $0.00 |
| **Total for this Order** | $400.87 | $35.00 |
| **Previous Account Balance** | | $0.00 |
| **Payment Received with this Order by CHECK** | | - $35.00 |
| **Balance Due Upon Receipt** | | $0.00 |

*A Balance Due may not reflect payments recently mailed separate from this order.*

Thank you for your participation!
Please remember that you can order refills online at **www.caremark.com**
If you have any questions, you can contact Caremark Customer Care at **1-866-999-7377**



EXHIBIT 26

*It all starts with care*

9889398091

004095456

**Balance Due Upon Receipt**

**$0.00**

**Name:** MERNA SUNDE
**Address:** 414 CRESCENT DR BOX 728
ALBERT LEA, MN 56007

*Please return the top portion of this form with your payment.*
*See reverse side for payment or refund options.*

*Retain the bottom portion of this form for your records.*

CAREMARK
*It all starts with care*

**Summary for Order:** 988939809
**Date:** 05/27/2005

| **Prescription Details** | **Benefit Provider Paid** | **Co-Pay Amount** |
|---|---|---|
| MERNA SUNDE<br>Rx# 704961310 Estradiol TAB 1MG, Qty. 90 EA<br>NDC 00339640311 | $4.25 | $10.00 |
| MERNA SUNDE<br>Rx# 705777980 Wellbutrn Xl TAB 300MG, Qty. 90 EA<br>NDC 00173073101 | $289.56 | $25.00 |
| MERNA SUNDE<br>Rx# 705778054 Minocycline CAP 100MG, Qty. 90 EA<br>NDC 00093316753 | $130.34 | $10.00 |
| MERNA SUNDE<br>Rx# 704961265 Triamt/hctz TAB 37.5-25, Qty. 90 EA<br>NDC 00591042405 | $4.75 | $10.00 |
| MERNA SUNDE<br>Rx# 704961249 Metoprol Tar TAB 25MG, Qty. 90 EA<br>NDC 57664050618 | $1.16 | $10.00 |
| Shipping Charge | | $0.00 |
| **Total for this Order** | $430.06 | $65.00 |

| | |
|---|---|
| **Previous Account Balance** | $0.00 |
| **Payment Received with this Order by CHECK** | - $65.00 |
| **Balance Due Upon Receipt** | $0.00 |

*A Balance Due may not reflect payments recently mailed separate from this order.*

Thank you for your participation!
Please remember that you can order refills online at **www.caremark.com**

*It all starts with care*

764659087105

004095456

**Balance Due Upon Receipt**

$0.00

**Name:** MERNA SUNDE
**Address:** PO BOX 728
ALBERT LEA, MN 56007

*Please return the top portion of this form with your payment.*
*See reverse side for payment or refund options.*

*Retain the bottom portion of this form for your records.*

CAREMARK
*It all starts with care*

**Summary for Order:**

**Date:** 07/08/2005

| **Prescription Details** | **Benefit Provider Paid** | **Co-Pay Amount** |
|---|---|---|
| MERNA SUNDE<br>Rx# 630288690 Tretinoin CRE 0.025%, Qty. 3 PKG<br>NDC 66530024320 | $48.73 | $10.00 |
| MERNA SUNDE<br>Rx# 630288721 Tri-luma CRE, Qty. 3 PKG<br>NDC 00299595030 | $190.12 | $25.00 |
| Shipping Charge | | $0.00 |
| **Total for this Order** | $238.85 | $35.00 |

| | |
|---|---|
| **Previous Account Balance** | $0.00 |
| **Payment Received with this Order by VISA** | - $35.00 |
| **Balance Due Upon Receipt** | $0.00 |

*A Balance Due may not reflect payments recently mailed separate from this order.*

Thank you for your participation!
Please remember that you can order refills online at **www.caremark.com**

*It all starts with care*

1335981401

004095456

**Balance Due Upon Receipt**

$0.00

**Name:** MERNA SUNDE
**Address:** 414 CRESCENT DR BOX 728
ALBERT LEA, MN 56007

*Please return the top portion of this form with your payment.*
*See reverse side for payment or refund options.*

CAREMARK
*It all starts with care*

*Retain the bottom portion of this form for your records.*

**Summary for Order:** 133598140
**Date:** 02/24/2005

| **Prescription Details** | **Benefit Provider Paid** | **Co-Pay Amount** |
|---|---|---|
| MERNA SUNDE<br>Rx# 704961249 Metoprol Tar TAB 25MG, Qty. 90 EA | $1.16 | $10.00 |
| MERNA SUNDE<br>Rx# 704961265 Triamt/hctz TAB 37.5-25, Qty. 90 EA | $4.75 | $10.00 |
| MERNA SUNDE<br>Rx# 704961310 Estradiol TAB 1MG, Qty. 90 EA | $4.25 | $10.00 |
| Shipping Charge | | $0.00 |
| **Total for this Order** | $10.16 | $30.00 |

| | |
|---|---|
| **Previous Account Balance** | $0.00 |
| **Payment Received with this Order by CHECK** | - $30.00 |
| **Balance Due Upon Receipt** | $0.00 |

*A Balance Due may not reflect payments recently mailed separate from this order.*

Thank you for your participation!
Please remember that you can order refills online at **www.caremark.com**

*It all starts with care*

4791694401

004095456

**Balance Due Upon Receipt**

$0.00

**Name:** MERNA SUNDE
**Address:** PO BOX 728
ALBERT LEA, MN 56007

*Please return the top portion of this form with your payment.*
*See reverse side for payment or refund options.*

*Retain the bottom portion of this form for your records.*

CAREMARK
*It all starts with care*

**Summary for Order:** 479169440
**Date:** 07/29/2005

| Prescription Details | | | Benefit Provider Paid | Co-Pay Amount |
|---|---|---|---|---|
| MERNA SUNDE<br>Rx# 705777980 Wellbutrn Xl TAB 300MG,<br>NDC 00173073101 | Qty. | 90 EA | $289.56 | $25.00 |
| MERNA SUNDE<br>Rx# 705778054 Minocycline CAP 100MG,<br>NDC 00093316753 | Qty. | 90 EA | $130.34 | $10.00 |
| MERNA SUNDE<br>Rx# 704961265 Triamt/hctz TAB 37.5-25,<br>NDC 00591042405 | Qty. | 90 EA | $4.75 | $10.00 |
| MERNA SUNDE<br>Rx# 704961249 Metoprol Tar TAB 25MG,<br>NDC 57664050618 | Qty. | 90 EA | $1.16 | $10.00 |
| MERNA SUNDE<br>Rx# 704961310 Estradiol TAB 1MG,<br>NDC 00339640311 | Qty. | 90 EA | $4.25 | $10.00 |
| Shipping Charge | | | | $0.00 |
| **Total for this Order** | | | $430.06 | $65.00 |

| | |
|---|---|
| **Previous Account Balance** | $0.00 |
| **Payment Received with this Order by VISA** | - $65.00 |
| **Balance Due Upon Receipt** | $0.00 |

*A Balance Due may not reflect payments recently mailed separate from this order.*

Thank you for your participation!
Please remember that you can order refills online at **www.caremark.com**

*It all starts with care*

873530751113

004095456

**Balance Due Upon Receipt**

$0.00

**Name:** MERNA SUNDE
**Address:** PO BOX 728
ALBERT LEA, MN 56007

*Please return the top portion of this form with your payment.*
*See reverse side for payment or refund options.*

*Retain the bottom portion of this form for your records.*

CAREMARK
*It all starts with care*

**Summary for Order:** 873530751
**Date:** 11/01/2005

| **Prescription Details** | | | | **Benefit Provider Paid** | **Co-Pay Amount** |
|---|---|---|---|---|---|
| MERNA SUNDE<br>Rx# 704961249 | Qty: | 90 EA | Metoprolol TAB TAR 25MG<br>NDC 57664050618 | $0.94 | $10.00 |
| MERNA SUNDE<br>Rx# 704961265 | Qty: | 90 EA | Triamt/hctz TAB 37.5-25<br>NDC 00591042405 | $4.46 | $10.00 |
| MERNA SUNDE<br>Rx# 704961310 | Qty: | 90 EA | Estradiol TAB 1MG<br>NDC 00339640311 | $3.97 | $10.00 |
| MERNA SUNDE<br>Rx# 705777980 | Qty: | 90 EA | Wellbutrn Xl TAB 300MG<br>NDC 00173073101 | $283.39 | $25.00 |
| MERNA SUNDE<br>Rx# 705778054 | Qty: | 90 EA | Minocycline CAP 100MG<br>NDC 00093316753 | $127.59 | $10.00 |

| | | |
|---|---|---|
| Shipping Charge | | $0.00 |
| **Total for this Order** | **$420.35** | **$65.00** |

| | |
|---|---|
| **Previous Account Balance** | **$0.00** |
| **Payment Received with this Order by VISA** | **- $65.00** |
| **Balance Due Upon Receipt** | **$0.00** |

*A Balance Due may not reflect payments recently mailed separate from this order.*

Thank you for your participation!
Please remember that you can order refills online at **www.caremark.com**
If you have any questions, you can contact Caremark Customer Care at **1-866-999-7377**

restitution issues. See Exhibits A, B and C to the Scott Declaration.

Defendant attaches to her garnishment objections a copy of a Bureau of Prisons ("BOP") Sentencing Monitoring Computation form, dated August 14, 2001. See Exhibit L to the Scott Declaration. This BOP form is most certainly not a Court order. Instead, it merely sets forth information contained in an inmate's central file about the inmate's sentence, projected release date and supervision. One portion of the form addresses restitution, which may, by statute, be paid by return of property, in-kind services or payment for loss. See 18 U.S.C. § 3663A(b), 3664(f). That defendant's form says "PROPERTY: NO" is no bar to garnishment but simply a reference to the kind of restitution ordered by the Court.

2. Garnishment of monthly pension plan payments are not in violation of the Court-ordered payment terms.

Defendant's contention that the garnishment is in violation of Court-ordered payment terms is simply wrong. The J&C, dated July 24, 2001, initially ordered restitution paid on a monthly payment plan. However, the Court entered an Order of Clarification of Judgments on June 3, 2002, making restitution immediately due and payable. See Exhibits A and C to the Scott Declaration. When defendant did not pay in



EXHIBIT 3a

RUN DATE: 19-OCT-2005

PAYMENT HISTORY REPORT

FOR: 2001200378/002

Report: CZ_QRYG
PAGE: 1 OF 2

DEBTOR: Sunde, Merna
COURT NUMBER: 00-29(1) PAM
CURRENT LIABILITY BALANCE: $436,636.00

PRIORITY CODE: 02

| FIN SEQ | FIN CODE | COL TYPE | REC DATE | FORM/ REC BY | REC FROM | DEPOSIT NO. | CHECK NO. | BOP DEPOSIT NO. | PMNT AMT | POST DATE |
|---|---|---|---|---|---|---|---|---|---|---|
| 0002 | PMNT | 6B | 18-JUN-2002 | OT/A | M. SUNDE | | 700 423704 | | $26,900.00 | 19-JUN-2002 |
| 0003 | PMNT | 6B | 03-SEP-2003 | CL/A | M. SUNDE - BOP | | BOP | | $25.00 | 17-OCT-2003 |
| 0005 | PMNT | 6B | 07-JUL-2004 | CL/A | Merna | | 400275225 | | $100.00 | 07-JUL-2004 |
| 0006 | PMNT | 6B | 04-AUG-2004 | CL/A | Merna | | 400275877 | | $100.00 | 04-AUG-2004 |
| 0007 | PMNT | 6B | 07-SEP-2004 | CL/A | Merna | | 700432605 | | $100.00 | 07-SEP-2004 |
| 0008 | PMNT | 6B | 04-OCT-2004 | CL/A | Merna | | 400276986 | | $100.00 | 04-OCT-2004 |
| 0009 | PMNT | 6B | 04-NOV-2004 | CL/A | Merna | | 400277654 | | $100.00 | 04-NOV-2004 |
| 0010 | PMNT | 6B | 06-DEC-2004 | CL/A | Merna | | 400278048 | | $100.00 | 13-DEC-2004 |
| 0012 | PMNT | 6B | 05-JAN-2005 | CL/A | Merna | | 400278465 | | $100.00 | 05-JAN-2005 |
| 0013 | PMNT | 6B | 01-FEB-2005 | CL/A | Merna | | 400279920 | | $100.00 | 02-FEB-2005 |
| 0014 | PMNT | 6B | 07-MAR-2005 | CL/A | Merna | | 400280969 | | $100.00 | 07-MAR-2005 |
| 0015 | PMNT | 6B | 04-APR-2005 | CL/A | Merna | | 400281484 | | $100.00 | 05-APR-2005 |
| 0016 | PMNT | 6B | 09-MAY-2005 | CL/A | Merna | | 400283416 | | $100.00 | 10-MAY-2005 |
| 0017 | PMNT | 6B | 06-JUN-2005 | CL/A | Merna | | 400284194 | | $100.00 | 07-JUN-2005 |
| 0018 | PMNT | 6B | 06-JUL-2005 | CL/A | Merna | | 284777 | | $100.00 | 12-JUL-2005 |
| 0019 | PMNT | 6B | 23-AUG-2005 | CL/A | Merna | | 296560 | | $100.00 | 24-AUG-2005 |
| 0020 | PMNT | 6B | 12-SEP-2005 | CL/A | Merna | | 286939 | | $100.00 | 13-SEP-2005 |
| 0021 | PMNT | 6B | 04-OCT-2005 | CL/A | Merna | | 287361 | | $100.00 | 05-OCT-2005 |

Total Payments for Debtor: $28,525.00

EXHIBIT 4a

# News you can use

We hope these summaries are helpful, but please remember that reading our case summaries is no substitute for reading the actual case. Doing so is the only way to discover if the case applies to your own situation. And remember that case law in one circuit may not develop in the same way in your circuit; such "circuit splits" are common. There is no substitute for reading the law in your own circuit.

## Habeas corpus

***Hearing counsel*** — *Green v. United States*, 262 F.3d 715 (8th Cir. 2001). An indigent petitioner proceeding under 28 U.S.C. § 2255 is entitled, under Rule 8(c) of the Rules Governing Section 2255 Proceedings, to the assistance of counsel when the district court determines, under Rule 8(a), that a hearing is necessary to assess the merits of the petition. The failure to appoint counsel for Rule 8 hearings is not harmless error and requires that the denial of relief be vacated. Noting that Rule 8(c) provides a "bright-line" rule, the appeals court pointed out that while section 2255 petitioners are not entitled to counsel, an evidentiary hearing is like a criminal trial and denial of counsel at such a proceeding is structural error. In this split decision the Eighth Circuit joined all others considering the issue, concluding that the error is not harmless (3rd, 4th, 5th, 6th, and 11th).

**Effective assistance and prejudice** — *Miller v. Champion*, 262 F.3d 1066 (10th Cir. 2001). A defendant alleging that ineffective assistance of counsel caused him to plead guilty may demonstrate prejudice by showing that, but for counsel's ineffective assistance, he would have gone to trial. He need not demonstrate a reasonable probability that he would have then been acquitted. The petitioner's § 2255 had been denied below because the judge determined that even had he not followed counsel's advice, he would have been found guilty. The court explained that while the likelihood of an acquittal need not be proven, it could be used in assessing whether a petitioner's claim that he would have proceeded to trial was credible.

**Renaming post-conviction motions** — *Henderson v. United* States, 2001 U.S. App. Lexis 1066 (7th Cir. 8/29/01). Sometimes federal courts rename post-conviction motions and determine they should be considered as motions filed under 28 U.S.C. § 2255, even though the petitioner did not intend them to be § 2255 motions. In this case, the 7th Circuit joined others in declaring that unless the petitioner is advised that the court has deemed his post-conviction motion a § 2255 motion and is given the opportunity to withdraw it, it will not be considered a § 2255 motion. The court explained that while district courts have the authority to rename such motions, a defendant should be given the opportunity to withdraw them because of the strict rules that restrict the courts' ability to consider second or successive § 2255 motions. Other courts of appeals have treated such renaming in a similar fashion. (1st, 2nd, 3rd and 10th).

## Money laundering

**Burden of proof** — *United States v. Frigerio-Migiano*, 254 F.3d 30 (1st Cir. 2001). The First Circuit overturned a money-laundering conviction obtained under 18 U.S.C. § 1956. The defendant conceded that he had engaged in a "financial transaction" as defined by the statute and the court assumed that he also knew that the funds were illegally derived. The court held that the government had not proven that the defendant also knew that the transactions in which he participated were part of a money-laundering scheme. The court ruled that the government must prove two things beyond a reasonable doubt: first that the defendant knew the funds involved in the financial transaction were illegally obtained, and second that he knew the financial transaction he was engaged in was "designed in whole or in part to conceal the nature, location, source, ownership, or control of the proceeds of such unlawful activity." 18 U.S.C. § 1956(a)(1)(B)(i). The defendant had made a number of deposits into a bank and counted money. The sole testifying witness against him only testified to the fact that he made deposits; the government did not present evidence that the defendant knew about the purpose of the deposits.

## Departures

**Diminished capacity departure** — *United States v. Shore*, 143 F.Supp.2d 74 (D.Mass. 2001). Ms. Shore, who had pled guilty to a tax offense, successfully sought a four-level reduction for diminished capacity, due to her history of severe depression and post-traumatic stress disorder occasioned by the death of her young daughter from leukemia. Rejecting the government's argument that Ms. Shore's suicide attempt prior to her court appearance was contrived to gain the court's sympathy, and relying on the report of a forensic psychiatrist of Ms. Shore's debilitating mental illness, the court analyzed her condition in light of U.S.S.G. § 5K2.13. The guideline had been amended in 1998 in a way that significantly broadened its scope to include "volitional impairment as well as cognitive impairment." "[T]he new standard, 'significantly reduced mental capacity,' is now defined . . . as 'a significantly impaired ability to (a) understand the wrongfulness of the be-

EXHIBIT 5a

havior . . . ; or (b) control [wrongful] behavior . . . ." While a court must find that the significantly reduced mental capacity contributed to the commission of the offense, it need not be the sole cause of the offense. Finding that the defendant's mental condition fit the criteria, the judge concluded that the goal in such cases is to assist those "who are less culpable because their actions were rooted in their psychiatric problems." Avoiding incarceration in this case permitted the defendant to continue to receive the medical and psychiatric care she required.

**"Cultural assimilation" departure** — *United States v. Rodriguez-Montelongo*, 2001 U.S. App. Lexis 19020 (5th Cir. 2001). Citing *Koon v. United States*, 518 U.S. 81 (1996), the 5th Circuit became the third circuit to approve a downward departure based on an alien's "long-term residence and cultural assimilation within the United States." (The other two are the 9th and 11th.) The defendant, a Mexican citizen, had lived in the United States since the age of three, was a legal resident, was educated, had married, and raised four children here. Following his arrest and deportation on a drug charge, he reentered the country in violation of 8 U.S.C. § 1326. He was subject to a sentence of 41 to 51 months. He unsuccessfully moved for a downward departure and appealed, arguing that the district court had erred in believing that it had no authority to depart based on cultural assimilation. The 5th Circuit agreed with the defendant and remanded the case to the district court.

## Adjustments

**Acceptance of responsibility** — *United States v. Ochoa-Gaytan*, No. 99-50366 (9th Cir. 9/7/01). The fact that a defendant attempted to suppress his confession and proceed to trial did not disqualify him from receiving an adjustment for acceptance of responsibility. Following the defendant's conviction for illegal reentry, the probation department recommended a three-level downward adjustment because the defendant had admitted the essential facts to the arresting officer and provided full disclosure to border patrol agents. At sentencing he was denied the adjustment because he had not pled guilty and had moved to suppress his statements. The court of appeals reversed, finding that the district court had assumed the defendant was "categorically ineligible" for the adjustment and noting that the defendant had "made no affirmative defense, called no witnesses and presented no evidence." U.S.S.G. § 3E1.1(b)(1) requires only that the defendant provide timely information concerning his involvement in the offense. The appeals court noted that the defendant was entitled to "require the government to satisfy its constitutional burden of proving beyond a reasonable doubt" that he had committed the crime. The court also found erroneous the lower court's assumption that because the defendant tried to suppress his statements was grounds to deny an acceptance adjustment. The *Miranda*-based challenge was constitutionally protected conduct that could not be held against him.

## Plea bargains

**Appeal waivers and a "miscarriage of justice"** — *United States v. Teeter*, 257 F.3d 14 (1st Cir. 2001). Increasingly, prosecutors insist that defendants negotiating plea agreements waive their rights to appeal. Rule 11(c)(6) of the Federal Rules of Criminal Procedure was amended in 1999 to require that the judge advise the defendant in open court of the waiver of appeal rights and insure that the defendant understands the waiver. Reviewing courts have tended to uphold such waivers. The practice is frequently criticized on the grounds that a defendant cannot possibly know all the factors that might render the plea or sentence illegal or unconstitutional. Such pleas may not have been "knowing and intelligent" as the law requires.

In this case, a stipulation in the plea agreement established the guideline base offense level and a waiver of the right to appeal the sentence. At the plea colloquy, the court asked the defendant whether she understood the terms of the plea agreement. The judge then determined that the plea had been voluntary. The judge did not mention that the plea agreement contained the appeal rights waiver and instead advised the defendant that she had a right to appeal her sentence. At sentencing, the judge again advised the defendant, who had unsuccessfully sought various departures and adjustments, that she had the right to appeal her sentence. The government never corrected the judge's statements, but later argued that the defendant could not appeal due to the waiver provision.

Consistent with the practice in other circuits, the 1st Circuit endorsed appeal waiver provisions in general, so long as the waiver is voluntary and made with knowledge of its consequences. The court declared that a district court must inquire specifically into any appellate rights waiver and failure to do so may invalidate the waiver. That said, an oral statement by the court advising a defendant that she may appeal (even though she has waived the right) will not automatically cancel a waiver. Such cases must be examined individually. The court also held that where "denying a right of appeal would work a miscarriage of justice, the appellate court, in its sound discretion, may refuse to honor the waiver." Similarly, plain sentencing error should be appealable under the miscarriage of justice standard. In the defendant's case the court could not be confident, in light of the court's failure to inquire into the waiver with the defendant and its advice that she was entitled

dard of decision, preponderance of the evidence (judge) versus beyond a reasonable doubt (12 jurors) becomes critical for defendants facing a mandatory increase.

The government, represented by Michael Dreeben of the Solicitor General's office, urged the Court to uphold the sentence. He argued that the gun statute defines one crime and establishes a minimum sentence of five years and a maximum sentence of life, thus not implicating *Apprendi*, which is concerned with sentences that exceed maximum penalties set by legislatures. He characterized the mandatory minimums in the statute as "additional guidance as to where the penalty should be set." He also relied on *McMillan v. Pennsylvania*, 479 U.S. 79 (1986), in which the Supreme Court ruled that legislatures may choose sentencing factors to guide judges.

Justice Breyer, another *Apprendi* dissenter, said *Apprendi* appears to apply in this case, because, except for mandatory minimums, the two cases implicate similar concerns. Dreeben said Harris is different because the seven-year sentence was below the statutory maximum sentence of life and was one the judge could have chosen to give Harris, even without the mandatory minimum. This prompted Justice Scalia to point out that following that reasoning, *Apprendi* is just about how a statute is drafted and the way to fix such statutes is to rewrite them to reset the statutory maximums.

Dreeben argued that the mandatory minimums do not remove judicial discretion because defendants may still receive substantial assistance departures and in drug cases, safety valve relief. He warned that if the petitioner prevailed on his argument that *Apprendi* should apply because the defendant is substantially disadvantaged by the mandatory minimum, then the guidelines and withdrawal of good-time credits might be swept into the rule. Justice Breyer noted that according to *Harris*, "the shortest mandatory minimum is far more important to any individual defendant that the highest theoretical possible term . . . and that does not lead you down the path you are talking about." The government conceded the point that its burden, charging those facts that trigger mandatory minimum sentences, would be minimal, but warned that the states would have a greater burden.

FAMM filed an amicus brief in the *Harris* case with the able assistance of litigation board member Peter Goldberger, Esq., of Ardmore, Pa., and Kyron Huigens, professor, Benjamin N Cardoza School of Law, New York.

---

Besides the *Apprendi* cases, the Supreme Court also took up the question whether defendants considering pleading guilty are entitled to helpful information that the government would have to turn over if the defendant chose to go to trial.

***United States v. Ruiz*, No. 01-595. Case below, 241 F.3d 1157 (9th Cir. 2001) (See *FAMMGram*, Vol. 12, Issue 1, page 16.)**

In *Brady v. Maryland*, 373 U.S. 83 (1963), the Supreme Court held that prosecutors must disclose evidence that is material and favorable to the defense. The Ninth Circuit ruled that defendants may not be required to waive their rights under *Brady* when entering plea agreements. Pleas where such waivers are required are not knowing, intelligent and voluntary as required by the constitution.

Solicitor General Theodore Olson argued that the Constitution does not mandate the rule by the Ninth Circuit and warned that it would expose convictions on plea agreements (95 percent of all convictions obtained) to collateral attack and undermine plea bargains by removing incentives for the government to offer them. *Brady*, he said, deals with trial rights, not tactical pre-trial decisions, and protects the innocent, not, as in this case, someone who has pled guilty. Justice Stevens inquired about the innocent defendant facing a lengthy sentence who may be induced to plead guilty and take the government's offer, believing mistakenly that the government's case against him is strong. Justice Kennedy also expressed concern about the innocent client who thinks the odds are against him. General Olson said Ruiz was not innocent and cited other protections, such as the inquiries required by Fed. R. Crim. P. 11 and the Sixth Amendment right to counsel. He also warned that the logical extension of *Ruiz's* argument would unduly expand the government's obligation if the right hinges on a right to know how to approach plea bargaining: the government will be required to provide its evidence about the defendant's guilt. Justice Scalia responded that the legal system must do all it can to ensure that the innocent are not induced to plead guilty.

Federal Public Defender Steven F. Hubachek told the Court that fairness and due process require disclosure. He cited *Hill v. Lockhart*, 474 U.S. 52 (1985), which held that a defense attorney who fails to find exculpatory evidence that would have prevented his client from pleading guilty has rendered ineffective assistance of counsel under the Sixth Amendment. The due process clause, he argued, should similarly prevent the government from obtaining an unreliable conviction by concealing evidence that the defense attorney is obliged by the Sixth Amendment to uncover. If a plea is invalid under *Hill*, the plea should also be invalid when the government withholds information. He also pointed out the significant pressures for the innocent as well as the guilty to plead guilty.

An exchange followed in which Justice Ginsburg observed that Hubachek represents a guilty defendant while he advocates for a rule on behalf of the innocent, and Justices Rehnquist and O'Connor echoed the observation. Hubachek pointed out that the rule would benefit all defendants considering guilty pleas and disputed the government's contention that existing rules are sufficient. Justice Souter was concerned that if the issue is the reliability of the guilty plea, the government would have to disclose all the information, favorable and unfavorable. Hubachek responded that to be disclosable the evidence must be of the kind that would change the outcome of the trial, were one to have occurred.

[redacted]

**Misconduct and excesses by federal prosecutors pertaining to money laundering offenses as reported by the press and the courts**

From January 10-15, 1993, the Washington Post published a series of six stories about the growing number of cases involving prosecutorial misconduct at the federal level. The articles, under the general heading "The Appearance of Justice", dealt with prosecutorial misconduct involving, among other things, "stings" and money laundering cases. In one of the articles a decision by Federal Judge James Ideman was reported, who dismissed a major racketeering and money laundering case on grounds of prosecutorial misconduct. Judge Ideman charged that the U.S. Attorney in that case withheld exculpatory (Brady material) evidence completely exonerating all the defendants, while showing the government's main witness to be a perjurer. The appellate court characterized the prosecutor's conduct as "intolerable" and recommended that the Attorney General review the case and decide whether the prosecutor should be subjected to departmental discipline. Judge Ideman complained in strong terms that after three years he was still waiting for the Department of Justice to address his charges against the prosecutor. In fact, he suggested a whitewash.

In other articles the Washington Post cited many other cases and examples of prosecutorial abuse, numerous instances of failure to disclose favorable evidence, government intrusion into the relationship between defense attorneys and clients, intimidation of witnesses and overzealous tactics designed to force guilty pleas before trial. The Post pointed out, that the Justice Department has been slow to investigate its own lawyers and has refused to release the results of investigations when completed.

On a December 20, 1993 editorial entitled "A Reno Reform" (page A24), it was mentioned that the "Washington Post" had received a letter from Attorney General Janet Reno responding to the articles on prosecutorial misconduct. Attorney General Reno promised actions that could lead to important and much needed reforms within the Department of Justice. According to the "Post" more than a year later the proposed reforms by Attorney General Reno had not been implemented.

On April 30, 1994, the "Washington Post" reported on the 6th Circuit's appointment of a federal judge in Tennessee to investigate charges of federal prosecutorial misconduct in that state because the internal Department of Justice review could not be trusted. Also, the Washington Post cited the Supreme Court finding that federal prosecutors committed fraud in the Demianjak case as yet another example that prosecutorial misconduct of its attorneys is not being dealt honestly or effectively by the Department of Justice.

[Top of the page](#)

**AACLJ Lead Page**

[redacted]

EXHIBIT 5b

nothing to do with drugs or organized crime, who do not have a criminal history, and who do not even have a part in an underlying unlawful activity. Government prosecutors have gone overboard by charging excessively money laundering and manipulating improperly the high sentencing level of these laws. The Department of Justice has looked the other way and has even engaged in unprecedented conduct by lobbying and blocking from taking effect amendments to the sentencing guidelines proposed by the U.S. Sentencing Commission which would have discouraged the abuses of charging "money laundering" by government prosecutors

It is common knowledge that the money laundering statutes and the high sentencing levels have been grossly abused by Federal prosecutors in charging and plea practices. This is especially true of the "sting" money laundering statute where prosecutors have "carte blanche" to fabricate the low threshold "evidence" and conditions that will guarantee a conviction. In the absence of guidelines from the Justice Department, overzealous prosecutors, anxious to obtain convictions, stretch both the law and the due process requirements in charging targeted individuals. The vagueness in the wording of the law and its definitions provides prosecutors with an excuse to circumvent the due process requirement of representation of an unlawful activity in sting operations. The same federal prosecutors control the fabrication of the evidence which may even be subsequently tampered to make a "sting" work every time.

Charging abuses are often followed by plea-bargaining abuses. The high sentencing level of the money laundering statute gives federal prosecutors a formidable weapon with which they can coerce defendants into "plea-bargaining". Plea bargaining essentially becomes threatening and blackmail tempered with promises of leniency at sentencing if defendants "cooperate". Those who succumb to the pressure, often receive sentences which are substantially lower than the guidelines. For those who refuse to plea bargain, the same federal prosecutors will serve them with superseding indictments that often charge frivolous, unsupported "offenses". Even if these coercive tactics still fail to convince a defendant into "plea-bargaining", the benefit to prosecutors is that a defendant is stretched emotionally and financially to the breaking point so he cannot effectively put a defense. The charges in these superseding or collateral indictments often are dismissed by federal prosecutors just before trial but only after they have taken their toll on a defendant and he or she has been rendered financially destitute. Finally, when a case makes it to trial and the defendant is convicted, as prearranged, not only the mandatory minimums are applied in sentencing in such defendant's case but the prosecutors ask for enhancements for "obstruction of justice" and for "not accepting responsibility for the crime".

Two sets of standards seem to be applied by federal prosecutors related to sentencing for money laundering offenses. For defendants who agree to "plea-bargain", federal prosecutors and the courts are very lenient and deviate substantially from the minimum sentencing guidelines. For defendants who refuse to "plea bargain" not only the mandatory minimums are imposed but additional enhancement is provided for "obstruction of justice". There have been serious charging and plea-bargain abuses by federal prosecutors in money laundering prosecutions. Due process requirements of the money laundering statutes are often ignored by some federal prosecutors.

Unfortunately neither Congress, nor the Courts, nor the Department of Justice have done anything to prevent the charging and "plea bargaining" abuses of federal prosecutors. Congress recently passed Public Law 104-38, a law which prevented sentencing amendments proposed by the U.S. Sentencing Commission from taking effect. These amendments were the result of an extensive three year study and would have made it more difficult for government attorneys to abuse the money laundering laws or to coerce defendants into "plea bargaining". Congress directed the Department of Justice to prepare a report on "charging and plea bargain practices" and "steps being taken to assure the appropriateness of the money laundering laws". It remains to be seen whether the Department of Justice will address the misconduct and excesses of its own attorneys.

Congress should require the Department of Justice to provide proper charging and plea bargaining guidelines to its attorneys for money laundering offenses. Additional guidelines should be provided by the Department of Justice on how targets should be selected for deceptive government "sting" investigations using 18 U.S. Code, Section 1956 (a)(3); on how government confidential informants should be qualified, screened and monitored; on what is the effect of the Fifth Amendment's injunction against self-incrimination; on how to safeguard against abuses by overzealous prosecutors and law enforcement officers seeking convictions by any means; and on how outrageous government invasion of privacy can be avoided.

Top of the page

---

## Public Criticism of the Misapplication of the "Money Laundering" Laws and of the "Plea-Bargain" Practices of Government Attorneys. (U.S. Sentencing Commission record)

In the absence of guidelines from the Department of Justice in the use of the money laundering statute, several government attorneys have extrapolated and abused this law. The disparities in sentencing and the charging excesses of such federal prosecutors became clear at the U.S. Sentencing Commission's public hearings on the proposed sentencing amendments to the guidelines for money laundering offenses, held in the last three years. There was an overwhelming support for the Commission's proposed amendments from those who testified at the public hearings. There was also severe criticism about the lack of consistency and appropriateness in the use of the money laundering statutes. To illustrate the problem we will reiterate for the record only some of the comments made at some of these hearings of the Commission.

One of the principal authors of the money laundering statutes, was Mr. Charles W. Blau (U.S. Sentencing Commission's Public Hearing on Proposed Sentencing Guideline Amendments, March 22, 1993, Washington DC. Transcripts of the hearing p.256-261). Mr. Blau had worked for the Department of Justice in different capacities, including Chief of Narcotics, Associate Deputy Attorney General and Associate Attorney General. He played an active role in drafting the money laundering statutes and the memorandum of understanding between the various law enforcement agencies in using these statutes. He was extremely critical of the lack of consistency and appropriateness in the use of the money laundering statute. At the hearing, among other comments, he stated:

*"In looking at these statutes, .......and I think basically the people that were in the process with me felt, that the real intent of this statute was to get at professional money launderers, principally those associated with narcotics and organized crime.*
*In retrospect, I think there are probably two mistakes that we made....I think I would have liked to have limited this statute to instances where there was sophisticated criminal activity present, either with narcotics or with organized crime.*

*Secondly, I think I would have required the Department (Justice) to have exercised some central control over the use of this statute much more so than we did. The Department, in my view, basically has failed to have what I would call a realistic or a centralized process dealing with the use of this statute. There*

*are, in essence, 94 separate policies, and each U.S. Attorney, basically, in essence, decides how the statute is going to be abused or used, as the case may be."*

Pertaining to the charging and plea practices of Federal prosecutors with respect to the offense of money laundering, Mr.Bleau had the following comments:

*"....What we are seeing at least in my part of the country, which is Texas and the Southwest, is a continual threatening of the use of the money laundering statute in non-drug and non-organized crime cases."*

*"..... I think that it (the money laundering statute) has tremendous potential to be abused. I think in at least my area of the country, and particularly in the white collar non-drug area, we are seeing an abuse of the use of this statute. Plea negotiations, in short, have been replaced by threat negotiations, and using a very substantial and heavy-wielding club, the money laundering statute. This is a real threat. One may argue that it is either good plea bargaining on the part of the government or, alternatively, it is a little bit overzealous and coercive of the criminal justice process.*

*The question that I raise with the use of this statute, without any centralized controls, is whether the criminal justice process is being undermined by the use of a very easily proven criminal statute which is not connected in any way, shape or form with any organized crime activity or with organized drug activity. And the question with these guidelines has been, should a person be subjected to severe criminal sanctions, when his conduct amounts to no more than the base underlying offense. It is a bit like using a nuclear weapon against a single individual.*

*I think these changes proposed by the Commission are essential in bringing a little reality back into the prosecution charging process. I would have preferred that the department basically would have taken this on itself, would have overseen basically the use of this statute and would have culled out the cases where it was clearly an abuse of process to bring such an enormous charge against underlying conduct which did not deserve it.*

*My view of these guidelines, until basically Congress gets around to amending the statute, is that the underlying offense should be relevant and important factor in determining what penalties for money laundering connected with those type of offenses are.*

*I do believe that the courts are going to I think reach a position where they will not forever tolerate these charging abuses, and a very valuable prosecution tool will be unnecessarily limited, or bad case law. So I support your amendments completely."*

Mr. Stephen R. LaCheen, representing the Pennsylvania Association of Criminal Lawyers, in his endorsement of the Commission's guideline amendments commented (page 75):

*"We also comment favorably on your money-laundering amendments, as well as the amendments regarding sting operations, and there both, again, informed out of the concern to avoid manipulation of the guidelines in the plea-bargaining process, which in vast majority of cases, as you know, are resolved in plea negotiations."*

Mr. James M. Becker, representing the Criminal law Committee of the Federal Bar Association, commented as follows (p. 157):

*".....Our group has identified several instances in the Eastern District of Pennsylvania, and we think they exist nationwide, where the mere addition of that money laundering charge, especially under 18 U.S.C. sections 1956 and 1957, artificially raises the guideline level beyond that of the underlying offense, when there is no real money laundering activity that somehow makes the person's conduct more culpable than if they were just charged with a fraud offense......."*

Mr. Chuck Morley, an expert on the subject of money laundering and currency reporting laws under the Bank Secrecy Act, having served with the Criminal Investigation Division of the IRS and as Chief investigator of the U.S. Senate Subcommittee on Investigations, stated (p. 224):

*".......the revised guidelines reflect greater sensitivity to such factors as sophistications of money laundering conduct." "....the staff (Sentencing Commission) found that, historically, prosecutors have been stretching these guidelines significantly,..."*

*"Offenses that technically qualify as money laundering are frequently simply incidental to or component parts of the underlying crime. This has given rise to extensive disproportionate sentencing.....The sentencing report indicated that 68 percent of the defendants convicted of structuring either didn't know or did not believe the funds were illegal. .....Yet, these people could still get the same type of sentence as a major money launderer, somebody involved in a huge smurfing operation. So do the guidelines work? I don't think they work, unless what we are trying to do is fill the jails up....."' The Justice Department has said to me informally that we are trying to decriminalize money laundering or that we are trying to greatly lessen the offense of money laundering......." ".....To continue under the current guidelines is to ignore the realities of money laundering totally, while continuing to mete out disproportionate and unfair sentences to both drug and non-drug defendants."*

Mr. David Stewart of the law firm of Ropes and Gray, commented:

*"The basic principle announced by the Commission, which I strongly endorse, is an attempt to tie the base offense levels for this offense (money laundering) more closely to the underlying conduct that was the source of the illegal proceeds............in non-drug offenses you really do get an extraordinary increase in the penalty by including the money laundering charge. ..........I would even report that prosecutors confirm that is why they add money laundering counts, because the guidelines are so powerful with them. It is a bigger hammer. One case I saw that was 27 months in prison versus 6 months in prison.....Finally, I would note my agreement with the observation to the American Bar Association on the subject of stings, again, the concept of the money laundering offense to the underlying offense seems to me very important in that context, as well. It is a little trickier, of course, because there is no true underlying offense, so it has to be the represented underlying offense, but, again, it seems to me the proper ways to approach the problem."*

Mr. Paul B. Bergman, representing the New York Council of Defense Lawyers, had the following comments:

*"I think that this proposed amendment on the guidelines for money laundering goes one way towards eliminating what we consider to be unfair leverage and sometimes abusively exercised leverage with money laundering."*

Top of the page

# Justices reiterate importance of juries in sentencing phase

By Joan Biskupic
USA TODAY

WASHINGTON — Americans' right to a jury trial is more than two centuries old. But the idea that it requires jurors to take a more active role in criminal sentencings is a new Supreme Court trend that could affect courts across the nation. At the very least, it's causing rancor among the justices.

By a 5-4 vote Thursday, the court essentially rejected a Washington state sentencing guideline that allowed a judge to conclude independently that kidnapper Ralph Blakely's crime was cruel enough to deserve a 90-month prison term, rather than the recommended maximum of 53 months. The court, in an opinion by Justice Antonin Scalia, said that Blakely's right to a jury trial meant that jurors should have weighed in on any factors that boosted the sentence.

Dissenting justices declared that the decision could wreak "havoc" on courts nationwide and sidetrack efforts to use sentencing guidelines to make criminal punishments more uniform. Many legal analysts echoed such predictions, although defendants' rights advocates said the ruling was a boost for the rights of the accused.

Justices Sandra Day O'Connor and Stephen Breyer, two of the dissenters, said that "tens of thousands of criminal judgments are in jeopardy" on the state and federal levels. But it was difficult to determine how many inmates might have grounds for appeals because of the ruling and whether it might lead to reductions in their sentences or new hearings.

One thing was clear: The ruling in *Blakely vs. Washington* brings new complications for sentencing laws, new headaches for prosecutors and more legal avenues for defendants who want to challenge elements of the charges against them.



AP

**Scalia:** Wrote the majority opinion for the court.



Gannett News Service

**O'Connor:** Dissenter said process will be chaotic.

The upheaval in sentencing rules began in 2000, when a deeply divided court ruled in *Apprendi vs. New Jersey* that any factor that increases the penalty for a crime must be considered by a jury and proved beyond a reasonable doubt.

Two years later, the justices said that only juries, not judges, may decide whether factors exist to warrant the death penalty in a case. (In a separate case Thursday, the court ruled that its 2002 decision on death-penalty rules is not retroactive, rejecting arguments that might have invalidated more than 100 death sentences.)

Writing for the majority in the Blakely case, Scalia stressed a broad right to a jury trial: "Just as suffrage ensures the people's ... control in the legislative and executive branches, jury trial (ensures) their control in the judiciary."

Shattering the usual ideological alignments, the conservative Scalia was joined by liberal Justices John Paul Stevens, David Souter and Ruth Bader Ginsburg, along with another conservative, Clarence Thomas.

O'Connor predicted that trial courts would be thrown into chaos as prosecutors try to figure out the facts to set out in indictments to be sure that jurors review them. She also said that matters that have been handled quickly by judges now will be subject to jury hearings.

She was joined by two fellow conservatives, Chief Justice William Rehnquist and Justice Anthony Kennedy, and by Breyer, one of the court's liberals.

During the past quarter-century, the federal government and several states have developed guidelines to try to bring uniformity to sentences and to reduce the influence of a defendant's race or wealth. But such sentencing guidelines retained some discretion for judges.

O'Connor wrote that at least 10 states have sentencing guidelines that could be affected: Alaska, Arkansas, Florida, Kansas, Michigan, Minnesota, North Carolina, Oregon, Pennsylvania and Washington.

Blakely pleaded guilty to second-degree kidnapping after abducting his estranged wife at gunpoint in 1998. Jeffrey Fisher, Blakely's attorney, said he would seek resentencing and the release of his client, who Fisher says has served at least 53 months.

"I think this ruling is, by and large, good for all defendants," he said.

EXHIBIT 6a

Fri/Sat/Sun, June 25-27, 2004
www.usatoday.com

# Doubt cast on prison terms

## High court: Judges can't boost sentences

By Joan Biskupic
USA TODAY

WASHINGTON — The Supreme Court cast doubt on thousands of criminal sentences Thursday by ruling that a judge cannot boost a defendant's prison sentence beyond what is called for under sentencing guidelines unless a jury says there are grounds to do so.

The 5-4 ruling is a swipe at sentencing guidelines that the U.S. government and at least 10 states have written to try to curb disparities in sentences for similar crimes. The guidelines set standard prison terms for various crimes but leave judges some discretion to increase sentences for crimes that are particularly cruel or that may involve guns or drugs.

The court reversed a 90-month sentence for a Washington state man who, under state guidelines, normally would have received no more than 53 months. A judge tacked on the extra time after finding that Ralph Blakely acted with "deliberate cruelty" when he kidnapped his estranged wife in 1998.

Writing for the court, Justice Antonin Scalia said the judge's move violated Blakely's right to a trial by jury under the Sixth Amendment, which Scalia said requires that any facts essential to a sentence be proved to a jury beyond a reasonable doubt. He cited a 2000 ruling that said juries must resolve certain sentencing issues.

But dissenting justices said the decision could be a "disastrous" blow to two decades of efforts to make sentences uniform. And legal analysts said it will send shock waves through courthouses. They said indictments will have to be more complex, and jurors will have to weigh complicated issues that have long been left to judges.

"What I have feared most has now come to pass," Justice Sandra Day O'Connor said in a bitter dissent. "Over 20 years of sentencing reform are all but lost, and tens of thousands of criminal judgments are in jeopardy." She said each sentence that has been imposed under sentencing guidelines and that is on appeal is at risk of being reversed. She was joined by Chief Justice William Rehnquist, Anthony Kennedy and Stephen Breyer.

Sentencing guidelines date to the 1970s. They reflect concerns that race, wealth and other factors can unfairly affect sentences.

Analysts said the ruling also will affect plea bargains, the way most cases are resolved. They said prosecutors will have to ask defendants to waive their right to have a jury weigh in on every fact related to their case. "The consequences are huge," said Harvard University law professor Bill Stuntz.

moment. Defendant is responsible for the total amount earned by her fraudulent scheme.

Finally, Defendant argues that she was entitled to a 3-level reduction for acceptance of responsibility under U.S.S.G. § 3E1.1, rather that the 2-level reduction applied in the PSR. (See id. ¶ 33.) Given Defendant's dilatory tactics prior to finally pleading guilty, a 2-level reduction is appropriate.

**B. The Government's Objections**

The Government first contends that Sunde should receive a 2-level enhancement for her aggravating role in the offense. See § 3B1.1(c). Probation found Sunde to be an "average participant" and therefore did not apply any enhancement for her role in the offense. (PSR ¶ 31.) The Court agrees with Probation, and denies the Government's request in this regard.

The Government also objects to Probation's failure to include an enhancement for obstruction of justice for Sunde's numerous failures to appear before the Court when scheduled. See § 3C1.1. After careful consideration of the facts, the Court does not believe that an obstruction of justice enhancement is appropriate.

The Government objects to the PSR's 2-level reduction for acceptance of responsibility. Because Defendant did eventually plead guilty, a 2-level reduction on this basis is appropriate.

Finally, the Government seeks to have ¶ 52 stricken from the PSR. That paragraph repeats Sunde's allegations that postal and IRS agents physically abused her and her dog



EXHIBIT 7a

during her arrest. The Government contends that this paragraph is slanderous. According to Probation, ¶ 52 was included because it was "self-reported" by Sunde. The Court agrees with Probation. The paragraph will not be stricken.

## II. PURPOSES

Defendant pled guilty to the violation of 18 U.S.C. §§ 1956(a)(1)(A)(i) and 2, money laundering with intent to promote unlawful activity. The sentence that the Court imposes is intended to punish the Defendant and deter her from committing crimes in the future.

## III. APPLICATION OF THE GUIDELINES

The Court determines that the applicable guidelines are as follows:

| | |
|---|---|
| Total Offense Level: | 24 |
| Criminal History Category: | I |
| Imprisonment Range: | 51 to 63 months |
| Supervised Release: | 2 to 3 years |
| Fine Range: | $10,000 to $930,322 |
| Special Assessment: | $100 |

## IV. SENTENCE

51 months' imprisonment. Supervised release for 3 years. Special assessment of $100.

## V. STATEMENT OF REASONS

Prior to sentencing, Defendant moved for a downward departure on three grounds: (1) that there are mitigating circumstances of a kind and degree not adequately considered by the Sentencing Commission because the money she laundered was devoted to buying ad

such interrogation can not be introduced in the prosecution's case in chief as evidence of guilt. California v. Beheler, 463 U.S. 1121 (1983); Estelle v. Smith, 451 U.S. 454 (1981); Oregon v. Mathiason, 429 U.S. 492 (1977).

However, for these rights to be required there must be both prongs of the analysis met; that is, there must be custody and there must be interrogation or it's functional equivalent. See Illinois v. Perkins, 496 U.S. 292 (1990). Attached to this response as Exhibit 2 is a memorandum for file containing a statement of Postal Inspector David Austrum outlining the circumstances surrounding the statements by this defendant. The United States acknowledges that Ms. Sunde was not advised of her "Miranda Rights" prior to the statements contained in this memorandum for file. However, it is the position of the United States that Ms. Sunde was not in custody at the time of these statements and that certain of these statements were not as the result of interrogation.

CUSTODY

Under Miranda, custody is defined as "the deprivation of freedom of action in any significant way." Id. At 444. The defendant bears the burden of proving custody. See United States v. Charles, 738 F.2d 686, 692 (5th Cir. 1984). The court, in determining whether custody is present should assess the objective circumstances of the situation based on a perspective



EXHIBIT 7b

of a reasonable person placed in the position of the defendant at that time. Stansbury v. California, 511 U.S. 318 (1994); Berkemer v. McCarty, 468 U.S. 420 (1988). Here the defendant was at her own residence and was not arrested after the execution of the search warrant. In Michigan v. Summers, 452 U.S. 692 (1981), the Supreme Court held that an informal detention of a suspect during the execution of a legally obtained search warrant did not in and of itself constitute custody. The Court stated that any such detention in surroundings familiar to the defendant during the execution of a search warrant is "substantially less intrusive" than detention accompanying arrest. Likewise, in United States v. Ritchie, 35 F.3d 1477, 1485 (10th Cir. 1994) it was held that there was no custody of a suspect during the execution of a search warrant at their residence when they were unrestrained.

Accordingly, this court should find that there was no custody at the time of the execution of the search warrant and the statements made by the defendant should not be suppressed.

INTERROGATION

Many of the statements made by the defendant Ms. Sunde were spontaneous, were made before any questions were asked of her and were voluntary. See Rhode Island v. Innis, 446 U.S. 291 (1980) (recognizing that not all statements obtained after a person is in custody are to be considered the product of interrogation.) Accordingly, as these statements were not made in response to

questions which law enforcement "should know are likely to elicit an incriminating response from the suspect", they are not interrogation. Id. at 301.

Accordingly, this motion to suppress should be denied.

4. MOTION FOR EXCULPATORY MATTER

The United States has provided timely discovery in this case which far exceeds the requirements of Rule 16. The defendant has been informed that he has access to any evidence seized and has access to the reports in this case, even though these reports are not discoverable under Rule 16. In addition, as the defendant has access to all information currently in the possession of the United States he has any information that he might broadly characterize as exculpatory. In addition, should the United States learn of any further information, whether discoverable under Rule 16, Brady or Giglio, it will likewise be made available to the defendant. Accordingly, this motion should be denied as moot.

affidavit in question were not overbroad. In so doing, the Eighth Circuit Court of Appeals specifically stated that since the law of the Eighth and Tenth Circuits differed, a different analysis of the overbreadth issue applied thus creating a different outcome. Consequently, Defendant's reliance on Tenth Circuit caselaw, and more particularly the holding in Voss, is not persuasive in the instant case.

The Court finds that the warrant at issue is supported by probable cause and is sufficiently limited in scope as it specifically describes the places to be searched, items to be seized, and includes a supporting affidavit which provides a rationale as to why the items may be evidence of illegal activity.

C. Leon "Good Faith" Exception.

Even if the Court were to find that the warrant was overbroad, the decision in Leon applies to constitutionally excuse the overbreadth. The rule established in Leon applies to warrants which are broadly worded but are not so facially deficient that the executing officers could not reasonably presume the warrant to be valid. Stelton, 867 F.2d at 451.

In Leon, the Supreme Court recognized an exception to the exclusionary rule in those cases where a police officer conducts a search "in objectively reasonable reliance on a subsequently invalidated search warrant." The Court developed this exception by recognizing that the exclusionary rule developed under the Fourth Amendment is designed to deter police misconduct rather than to punish the errors of judges and magistrates. Id. at 916. The Court noted that where an officer acting in objective good faith has obtained a search warrant from a judge or magistrate and has acted within its scope, in most cases there is no police illegality and thus nothing to deter and, therefore, excluding the evidence will in no way affect the future conduct of that officer. Id. at 919-20. The Court stated:



EXHIBIT 8a

> [i]t is the magistrate's responsibility to determine whether the officer's allegations establish probable cause and, if so, to issue a warrant comporting in form with the requirements of the Fourth Amendment. In the ordinary case, an officer cannot be expected to question the magistrate's probable cause determination or his judgement that the form of the warrant is technically sufficient.

Id. at 921. However, the Leon Court defined four situations in which an officer's reliance on a warrant would be unreasonable: (1) where the issuing judicial officer was misled by information in an affidavit that the affiant knew was false or would have known was false except for his reckless disregard for the truth; (2) where the issuing officer wholly abandoned his neutral judicial role; (3) where the affidavit supporting the warrant contained so few indicia of probable cause "as to render official belief in its existence entirely unreasonable;" and (4) where the warrant itself is so facially deficient that no executing officer could reasonably presume it to be valid. Id. at 923.

The only Leon exception which Defendant argues applies in the instant case is that the search warrant is so facially overbroad that the executing officers could not reasonably rely on its validity. Defendant maintains that Inspector Austrum, who obtained the warrant and participated in its execution, could not possibly have entertained a good faith belief that the warrant was drawn with "scrupulous exactitude." Thus, Defendant argues that no "good faith" exception under Leon should apply. However, as previously discussed, Defendant's argument is based on application of the incorrect level of scrutiny of the warrant. As was the case in Stelten, a comprehensive affidavit explains the nature of the criminal offenses that are suspected to have occurred, and the author of that affidavit, who has extensive experience in investigating such matters, details the nature of the evidence to be sought. The warrant does not authorize the seizure of every business document or every item located in the Crescent Drive residence. The warrant and the affidavit indicate to the searching agents that they had to limit their seizure of

# United States District Court

SECRET

STATE AND DISTRICT OF MINNESOTA

In the Matter of the Search of
(Name, address or brief description of person or property to be searched)

414 Crescent Drive
Albert Lea, MN

## APPLICATION AND AFFIDAVIT FOR SEARCH WARRANT

CASE NUMBER: 98-mg-563 JEC

I David Austrum being duly sworn depose and say:

I am a(n) Special Agent, Postal Inspectors and have reason to believe that ☐ on the person of or ☒ on the premises known as (name,description and/or location)

414 Crescent Drive
Albert Lea, MN

in the State and District of Minnesota there is now concealed a certain person or property, namely (describe the person or property)

See attached list of items to be seized.

A true copy in 23 sheets (s) of the record in my custody. CERTIFIED 8/20 19 98 Francis E. Dosal, Clerk BY: Deputy Clerk

which is (state one or more bases for search warrant and seizure set forth under Rule 41(b) of the Federal Rules of Criminal Procedure)

property that constitutes evidence of the commission of a crime, contraband, fruits of criminal activity, and/or means of committing a crime

concerning a violation of Title 18, United States Code, Section(s) 371, 1341, 1342, 1343.

The facts to support a finding of Probable Cause are as follows:

See Affidavit attached hereto and incorporated herein by reference.

Continued on the attached sheet and made a part hereof. ☒ Yes ☐ No

David C Austrum
Signature of Affiant
David Austrum,
Postal Inspectors

Sworn to before me, and subscribed in my presence

August 11, 1998
Date and Time Issued

at Minneapolis, MN
City and State

FILED AUG 20 1998 FRANCIS E. DOSAL, CLERK
JUDGMENT ENTD
DEPUTY CLERK

J. EARL CUDD, U.S. Magistrate Judge
Name and Title of Judicial Officer

J Earl Cudd
Signature of Judicial Officer

Exhibit 1

EXHIBIT 86

the search and seizure implicate First Amendment rights to freedom of association. This argument is unavailing in light of the Eighth Circuit's decision in Wabun-Inini. The Court finds that an ordinary level of scrutiny should be applied when reviewing the scope of the warrant at issue in the instant case.

**B. Was the Search Warrant Impermissibly Overbroad in Particularizing the Evidence that Was Subject to Seizure?**

"The fourth amendment requires that a search warrant describe with sufficient particularity the things to be seized in order to prevent a 'general, exploratory rummaging' in a person's belongings." United States v. Kail, 804 F.2d 441, 445 (8th Cir. 1986), quoting Coolidge v. New Hampshire, 403 U.S. 443, 467 (1971). Since the degree of specificity that is required in applying the particularity requirement is flexible and may vary depending on the circumstances and the types of items involved, the Court applies a "practical accuracy" rather than a "technical nicety" standard. United States v. Wayne, 903 F.2d 1188, 1195 (8th Cir. 1990), citing Johnson, 541 F.2d at 1313; see also, United States v. Lowe, 50 F.3d 604, 607 (8th Cir. 1995); United States v. Hibbard, 963 F.2d 1100, 1102 (8th Cir. 1992), citing United States v. Pillow, 842 F.2d 1001, 1004 (8th Cir. 1988). As a result, "a search warrant involving a scheme to defraud is 'sufficiently particular in its description of the items to be seized if it is as specific as the circumstances and nature of activity under investigation permit.'" United States v. Saunders, 957 F.2d 1488, 1491 (8th Cir. 1992), quoting Kail, 804 F.2d at 445 (add'l citations omitted).

In the instant case, the Court's review of the affidavit and search warrant in question reveals that, taking into consideration the nature and circumstances of the crime alleged, the affidavit provides ample probable cause to support the warrant and the warrant is not facially overbroad. In order to find probable cause, the court issuing a search warrant must decide



EXHIBIT 8c